**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | |
|---|---|
| CITY UTILITIES OF SPRINGFIELD, MISSOURI, <br><br>                 Plaintiff, <br><br>     v. <br><br> 3M COMPANY, f/k/a Minnesota Mining and Manufacturing Co., <br><br>                 Defendant. | Civil Action No. _____ <br><br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I.     STATEMENT OF THE CASE

1.      City Utilities of Springfield, Missouri ("City Utilities") files this citizen suit Complaint against 3M Company ("3M"), formerly known as Minnesota Mining and Manufacturing Company, under 33 U.S.C. § 1365(a)(1), Section 505(a)(1) of the federal Clean Water Act ("CWA"), for the violation of a National Pollutant Discharge Elimination System ("NPDES") permit and for the unlawful discharge of pollutants from a point source to waters of the United States without a permit, and under 42 U.S.C. § 6972(a)(1)(B), Section 7002(a)(1)(B) of the federal Resource Conservation and Recovery Act ("RCRA"), for contributing to the release of a solid waste that presents an imminent and substantial endangerment to human health and the environment. 3M discharged and is discharging various pollutants through its stormwater outfalls and into groundwater in violation of its federal and State discharge permits and the CWA, and such illegally discharged pollutants are presenting an imminent and substantial danger to human health and the environment in violation of RCRA. Through this action, City Utilities invokes the

citizen suit provisions of the CWA and RCRA to act in the stead of the state and federal government to enforce federal and state permits issued to a 3M facility ("Springfield Plant"), violations which contravene the CWA and RCRA.[1] City Utilities seeks declaratory and injunctive relief to stop 3M's unlawful discharges and to remedy the public health impacts through the installation of technology at the City Utilities' Blackman Water Treatment Plant ("WTP") sufficient to achieve any applicable drinking water maximum contaminant levels ("MCLs"), Health Advisory Levels, or other regulatory requirements related to the pollutants at issue.

## II.  JURISDICTION AND VENUE

2.      This court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, jurisdiction under the CWA pursuant to 33 U.S.C. § 1365(a), and jurisdiction under the RCRA pursuant to 42 U.S.C. § 6872(a). The relief requested is authorized pursuant to 33 U.S.C. § 1365(a), 42 U.S.C. § 6972(a), and 28 U.S.C. §§ 2201 and 2202.

3.      City Utilities complied with the pre-suit notice provisions of the CWA and RCRA. City Utilities notified 3M of its intent to file suit for its ongoing violations of the CWA and RCRA associated with the unpermitted discharge and release of various per- and poly-fluoroalkyl chemicals ("PFAS") including perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonate ("PFOS"), perfluorohexane sulfonate ("PFHxS"), and perfluorobutane sulfonate ("PFBS"), and

---

[1] The allegations in this complaint are distinct and separate from those alleged in cases filed in the AFFF Multidistrict Litigation ("MDL") pending in the District of South Carolina, MDL No. 2:18-mn-2873. Cases in the MDL assert state tort law claims arising out of widespread manufacture, use, and disposal of AFFF products rather than ongoing violations of state and federal environmental laws by the Defendant. City Utilities has itself already filed a complaint in the MDL (Case No. 2:23-cv-03045-RMG) raising state law tort claims against a number of AFFF manufacturers, sellers, and distributors for the improper manufacture, sale, use, and disposal of these products causing widespread contamination to the environment and to City Utilities' sources of drinking water. The present case is distinguishable because City Utilities claims do not arise out of 3M's manufacture and sale of AFFF products, but rather to 3M's unauthorized discharge of PFAS in its stormwater, resulting in discrete Clean Water Act permit violations and causing RCRA "imminent and substantial endangerment" conditions that threaten the public's health and safety.

other PFAS from 3M's Springfield Plant on February 26, 2024. City Utilities served notice on 3M, Michael Regan, Administrator of the Environmental Protection Agency ("EPA"), Dru Buntin, Director of the Missouri Department of Natural Resources ("Missouri DNR"), and Meg McCollister, the Administrator of the U.S. EPA Region 7. A copy of the notice of intent letter ("Notice Letter") is attached as Exhibit A.

4. Over 90 days have passed since the Notice Letter was served.

5. The CWA and RCRA violations at 3M's Springfield Plant identified in the Notice Letter are ongoing and continuing such that 3M remains in violation of both statutes.

6. Neither EPA nor Missouri DNR has commenced and is diligently prosecuting an administrative, civil, or criminal action to redress 3M's violations of the CWA under 33 U.S.C. § 1319. 3M continues to discharge PFAS, including PFOA, PFOS, PFHxS, and PFBS, through stormwater outfalls at its Springfield plant in violation of its NPDES permit and the CWA.

7. EPA has not commenced an administrative, civil, or criminal action to require 3M to address the imminent and substantial endangerment to health or the environment associated with the release of the listed PFAS from its facilities under 42 U.S.C. § 6973 or 42 U.S.C. § 9606. Likewise, neither EPA nor Missouri DNR has initiated a removal action under 42 U.S.C. § 9604. Neither agency has incurred costs for a Remedial Investigation and Feasibility Study ("RI/FS"). Neither is diligently prosecuting 3M with a remedial action under 42 U.S.C. § 9601 *et seq.* EPA has not obtained a court order or issued an administrative order under 42 U.S.C. § 6973 or 42 U.S.C. § 9606 pursuant to which 3M is conducting a removal action, remedial action, or a RI/FS. Finally, Missouri DNR is not prosecuting an action against 3M under 42 U.S.C. § 6972(a)(1)(B). PFAS, including PFOA, PFOS, PFHxS, and PFBS, present in 3M's soil and stormwater system, thus, continue to contaminate the groundwater and surface waters of Jones

3

Spring, Pearson Creek, and the James River, including at City Utilities' water intake for the Blackman WTP.

8. City Utilities will serve a copy of this complaint on the Administrator of EPA and the Attorney General of the United States. *See* 42 U.S.C. § 6972(b)(2)(F).

9. Venue is appropriate in this District pursuant to 33 U.S.C. § 1365(c)(1), 28 U.S.C. § 1391(b)-(c), and 42 U.S.C. § 6972(a) because 3M's Springfield Plant is the source of the discharges and releases of PFAS in violation of both the CWA and RCRA that form a substantial part of the events and omissions giving rise to City Utilities' claims within the Western District of Missouri. The Western District of Missouri is also the judicial district in which City Utilities maintains its principal place of business.

## III. PARTIES

10. City Utilities is a community-owned utility providing, among other services, public drinking water to residents and businesses in a 320 square-mile area of southwest Missouri and the Springfield Metropolitan Area. City Utilities' principal place of business is located at 301 East Central Street, Springfield, Missouri, 65802.

11. City Utilities takes water from the James River for treatment at the Blackman WTP in the southeastern corner of Springfield. City Utilities monitors water quality from its water sources and treats its raw water every day to provide clean and affordable water to its customers.

12. Defendant, 3M Company, is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 3M Center in Saint Paul, Minnesota. 3M has continuously operated an adhesive and tape manufacturing facility at 3211 East Chestnut Expressway, Springfield, Missouri, 65802 since 1967.

4

13.     City Utilities is a "citizen" within the meaning of 33 U.S.C. Sections 1365(a) and 1365(g), and both City Utilities and 3M are "person[s]" within the meaning of 33 U.S.C. Sections 1362(5) and 1365(a). Both City Utilities and 3M are "person[s]" within the meaning of 42 U.S.C. Sections 6903(15) and 6972(a).

## IV.     STANDING

14.     The interest in the provision of safe drinking water that City Utilities seeks to protect is fundamental to its purpose. The James River is a vital drinking water source for City Utilities and the residents of southwest Missouri served by City Utilities.

15.     As shown in the figure below, City Utilities maintains a drinking water intake on the James River for its Blackman WTP just downstream of the confluence of Pearson Creek and the James River.



16.     3M's ongoing and unlawful discharge and release of PFAS compounds, including PFOA, PFOS, PFHxS, PFBS, and other PFAS, from its Springfield Plant into Jones Spring, Pearson Creek, and ultimately the James River, adjacent to the intake for City Utilities' Blackman

WTP, are in violation of the CWA and RCRA. These discharges threaten the health and safety of City Utilities' customers and City Utilities' operations.

17. Because of these unpermitted discharges, City Utilities has detected PFOS, PFBS, and PFHxS in its water supply.

18. The Blackman WTP is not equipped with technology that is capable of removing these PFAS chemicals. City Utilities will soon be obligated to remove PFOA, PFOS, PFHxS, and PFBS compounds released by 3M into the James River due to recently adopted EPA MCLs promulgated under the Safe Drinking Water Act. *See* PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024).

19. The treatment equipment and processes necessary to remove these pollutants will impose substantial economic costs on City Utilities related to both the initial construction and installation of treatment technology and the long-term operation and maintenance. For example, City Utilities will require routine replacement or recharging of activated carbon in a Granulated Activated Carbon ("GAC") filter.

20. Because neither EPA nor Missouri DNR has commenced an administrative, civil, or criminal action against 3M for its unpermitted discharge and release of PFOA, PFOS, PFHxS, PFBS, and other PFAS into City Utilities' drinking water supply, City Utilities' injuries will not be redressed absent an order from this Court requiring 3M to take immediate action to halt its ongoing illegal discharges, including to provide adequate treatment technology for the drinking water provided by City Utilities to its customers. Finally, because the PFOA, PFOS, PFHxS, PFBS, and other PFAS entering City Utilities' water supply stem from discharges from 3M's facility, City Utilities' injuries fall within the zone of interests protected by RCRA's imminent and substantial endangerment provision.

6

## V. LEGAL BACKGROUND

### A. The Clean Water Act

21. Section 301(a) of the CWA prohibits the "discharge of any pollutant by any person" into waters of the United States, except in compliance with the terms of a NPDES permit issued by EPA or a state authorized pursuant to Section 402(b) of the CWA to do so. 33 U.S.C. §§ 1311(a), 1342.

22. A NPDES permit is required for stormwater discharges associated with an industrial activity under the CWA. 33 U.S.C. § 1342(p)(2), (3).

23. Each violation of a NPDES permit, and each discharge of a pollutant that is not authorized by a permit, is a violation of the CWA. 33 U.S.C. §§ 1311(a), 1342(a), (k), 1365(f); 40 C.F.R. § 122.41(a).

24. Section 301's permitting requirement is also applicable to the discharge of pollutants "that reach navigable waters after traveling through groundwater if that discharge is the functional equivalent of a direct discharge from the point source into navigable waters." *Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 186 (2020). Some factors that are relevant to the determination of whether a discharge is functionally equivalent to a direct discharge into a water of the United States are:

> (1) transit time, (2) distance traveled, (3) the nature of the material through which the pollutant travels, (4) the extent to which the pollutant is diluted or chemically changed as it travels, (5) the amount of pollutant entering the navigable waters relative to the amount of the pollutant that leaves the point source, (6) the manner by or area in which the pollutant enters the navigable waters, (7) the degree to which the pollution (at that point) has maintained its specific identity.

*Id.* at 184-85. The "[t]ime and distance will be the most important factors in most cases, but not necessarily every case." *Id.* at 185

7

25. The "discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

26. "Navigable waters" are defined as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7). The "[w]aters of the United States" are, in turn, defined as waters which are "interstate" or are "[c]urrently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce." 40 C.F.R. § 120.2(a)(1)(i), (iii).

27. A "pollutant" is defined as a wide range of items, such as "chemical wastes … and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6).

28. A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

29. The CWA authorizes any "citizen" to bring civil actions in federal district court against any "person" who is allegedly in violation of an "effluent standard or limitation" set under the CWA. 33 U.S.C. § 1365(a); *see also id.* §§ 1362(5) (defining "person" as individual, corporation, or municipality); 1365(g) (defining "citizen" as a "person or persons having an interest which is or may be adversely affected"). An "effluent standard or limitation" is defined to include "an unlawful act under subsection (a) of Section 1311 of this title" and "a permit or condition of a permit issued under Section 1342 of this title that is in effect under this chapter." 33 U.S.C. § 1365(f).

30. Before citizens may file civil actions under the CWA, however, they must provide EPA, the state where the alleged violation has occurred, and the purported defendant notice of their intent to sue 60 days before filing their complaint. 33 U.S.C. § 1365(b)(1)(A).

31.     A state may apply for and receive EPA's approval to exercise delegated authority to administer a NPDES permit program. Missouri received approval to administer the NPDES permit program in 1974 and to administer a general permit program since 1985.

32.     Missouri DNR administers the NPDES permit program in Missouri pursuant to EPA authorization under section 402(b). 33 U.S.C. § 1342(b); Mo. Rev. Stat. §§ 644.026, 644.051; 10 C.S.R. § 20-6.200.

33.     Under Missouri's water quality standards, no water contaminant may be discharged into waters designated as "Metropolitan No-Discharge Streams" in Missouri except for "uncontaminated cooling water, permitted stormwater discharges in compliance with permit conditions, and excess wet-weather bypass discharges not interfering with designated uses." 10 C.S.R. § 20-7.031(7).

## B.     The Resource Conservation and Recovery Act

34.     Section 7002(a)(1)(B) of RCRA allows affected persons to bring suit against "any person, . . . including any past or present generator [of solid waste,] . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

35.     A "solid waste" is defined as "garbage, refuse . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." 42 U.S.C. § 6903(27).

36.     RCRA authorizes federal courts to issue injunctive relief under RCRA's citizen suit provision. 42 U.S.C. § 6972(a).

9

## VI. FACTUAL ALLEGATIONS

### A. Per- and Polyfluoroalkyl Substances Are Persistent, Mobile, and Toxic

37.     PFAS, including PFOA, PFOS, PFHxS, and PFBS, are a class of thousands of synthetic chemical compounds containing fluorine and carbon. The presence of multiple carbon-fluorine bonds in these substances makes them exceptionally strong, thermally, chemically, and biologically stable, and resistant to environmental degradation due to light, water, and biological processes.

38.     PFOA, PFOS, PFHxS, PFBS, and other PFAS also easily dissolve in water and may, thus, spread through the environment. These substances may also contaminate soils and leach from the soil into surface and groundwater over time.

39.     Because PFOA, PFOS, PFHxS, PFBS, and other PFAS are mobile and stabile, they may travel great distances and remain in the same chemical state for long periods of time.

40.     PFOA, PFOS, PFHxS, PFBS, and other PFAS are known to enter drinking water supplies from contamination in groundwater and surface water sources.

41.     Ingestion of contaminated water is a recognized source of human exposure to PFAS which can bioaccumulate, *i.e.*, increase in concentration in the tissue of an organism because the absorption of a substance is at a faster rate than the rate at which the substance is lost by metabolism and excretion.

42.     Human exposure to PFOA, PFOS, PFHxS, PFBS, and other PFAS has been linked to adverse health impacts.

43.     In 2012, a panel of three epidemiologists formed in response to a class action settlement arising from PFAS contamination in West Virginia found "probable links" between PFOA exposure and kidney cancer and testicular cancer. A "probable link" was defined "to mean

that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA exposure and a particular human disease."[2]

44.  Human exposure to PFOA and PFOS has subsequently been linked to developmental effects, higher cholesterol, liver malfunction, effects on the endocrine system, obesity, decreased immune response to vaccines, altered liver enzymes, and accelerated puberty. *See* Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39124, 39143-46 (May 8, 2024).

45.  Toxicity studies on animals exposed to PFHxS have, to date, reported adverse effects on development, the liver, and the thyroid. *See* Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638 at 18645.

46.  In acknowledgement and in response to the health risks associated with PFAS in drinking water, EPA released a lifetime health advisory ("HA") for PFOA and PFOS at 70 parts per trillion ("ppt") in drinking water in 2016. EPA subsequently lowered the HA to 0.02 ppt for PFOS and 0.004 ppt for PFOA in 2022. These HA concentrations reflect EPA's determination of the PFOA and PFOS concentrations in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure.

47.  In 2021, the Agency for Toxic Substance and Disease Registry, a division of the U.S. Department of Health and Human Services and the Centers for Disease Control and Prevention, reviewed the existing toxicological studies of PFAS. Its report identified and set minimum risk levels: estimates of the daily human exposure to a hazardous substance that is likely to be without appreciable risk of adverse noncancer health effects over a specified route and

---

[2] C8 SCI. PANEL, PROBABLE LINK EVALUATION OF CANCER (Apr. 15, 2012), http://www.c8sciencepanel.org/pdfs/Probable_Link_C8_Cancer_16April2012_v2.pdf

11

duration of exposure for PFOA, PFOS, and PFHxS due to their potential for causing adverse human health effects through oral exposure. *See* Toxicological Profile for Perfluoroalkyls, Agency for Toxic Substances and Disease Registry (May 2021), https://www.atsdr.cdc.gov/ToxProfiles/tp200.pdf.

48.     EPA took its most significant step to address the adverse health effects of PFAS in April 2024 when it adopted MCLs for PFOA, PFOS, PFHxS, and PFBS in drinking water. *See* PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532. The MCL for PFOA and PFOS in drinking water was set at 4.0 ppt and at 10 ppt for PFHxS. *Id.* at 32746-49. In addition, EPA proposed a hazard index threshold for a mixture of four PFAS, including PFHxS and PFBS, that public water systems may not exceed in the finished drinking water they provide to consumers. *Id.*

49.     EPA proposed these MCLs in 2023 to account for the potential "adverse health effects observed following oral exposure" to PFOA, PFOS, PFHxS, and PFBS. PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18638, 18643 (proposed Mar. 29, 2023). EPA's MCLs for PFOA, PFOS, and PFHxS and the hazard index for PFHxS and PFBS are strict requirements that public water systems, like City Utilities, must meet to protect the health of consumers of their public drinking water.

50.     Most recently, in May 2024, EPA designated PFOA and PFOS as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9602(a). *See* Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed. Reg. 39124 (May 8, 2024). This designation reflects EPA's judgment that PFOA and PFOS present a substantial danger to public health or welfare and the environment when released. *Id.* at 39143-49

12

(summarizing EPA's understanding of the carcinogenic, developmental, cardiovascular, liver, endocrine, metabolic, reproductive, and musculoskeletal effects of the two PFAS). In particular, EPA referenced that mobility and persistence of PFOA, PFOS, and other PFAS raises the likelihood they will enter drinking water supplies, be absorbed, and remain in the human body. *See id.* at 39147-48. EPA listed this consideration as an important factor in its assessment of the carcinogens' potential to present a danger to the public health or welfare and environment. *Id.*

### B. 3M's Springfield Plant Ultimately Discharges PFAS into the James River in Violation of Its Stormwater Permit and Without Permit Authorization.

51.     Since 1967, 3M has operated its Springfield Plant at 3211 East Chestnut Expressway in Springfield, Missouri to manufacture adhesive and tape products.

52.     As part of its operations, 3M's Springfield Plant maintains a stormwater system with five outfalls that drain into, among other waterbodies, Jordan Creek and ultimately the James River.

53.     The James River is a navigable water. Jordan Creek, Pearson Creek, and Jones Spring are tributaries of the James River. Missouri DNR designated the stretch of the James River immediately downstream of its confluence with Pearson Creek for drinking water supply.

54.     3M currently operates its Springfield Plant subject to industrial stormwater general permit MOR23A098 as authorized under 10 CSR 20-6.200 by the Missouri DNR. This general permit from Missouri DNR authorizes 3M to discharge stormwater flowing off its 3M Springfield Plant to Jordan Creek and ultimately the James River, so long as 3M complies with the permit's terms.

55.     3M is not authorized under the permit to discharge "process wastewaters, treated or otherwise, including contact and non-contact cooling waters; boiler blowdown; or water used to wash machinery, equipment, buildings, or pavement." General Permit MO-R23A, Mo. Dep't

13

Nat. Res. ¶13.[3] Similarly, the permit explicitly prohibits discharges "which are located in a way to allow water to be released into sinkholes, caves, fissures, or other openings in the ground which could drain into aquifers directly or indirectly." *Id.* at ¶5. 3M's stormwater permit also does not authorize the discharge of process wastewaters or contaminated stormwater into the watershed of a Metropolitan No-Discharge Stream. *Id.* at ¶4.

56. The 3M Springfield Plant is situated in a karst landscape containing sinkholes and groundwater that moves off the Springfield Plant's immediate property. A documented sinkhole (G28) is less than a mile from 3M's Springfield Plant on an adjacent lot and along the route of its stormwater discharges into Jordan Creek and ultimately the James River.



[3] *Available at* https://dnr.mo.gov/water/business-industry-other-entities/permits-certification-engineering-fees/stormwater/chemical-manufacturing-mo-r23a000.

57.     Dye tracing has demonstrated that the water discharged into sinkhole G28 travels to Jones Spring in as little as two days.

58.     On information and belief, the stormwater and groundwater from 3M's Springfield Plant flows into several karst features and sinkholes, including sinkhole G28, which, in turn flows into Jones Spring, a tributary that empties into Pearson Creek, which, in turn empties into the James River, less than half a mile upstream of City Utilities' water intake for its Blackman WTP.

59.     As part of its operations, 3M installed and operates an outdoor fire suppression system to cover its solvent tanks and unloading area. 3M tests this fire suppression system annually with city water. On information and belief, 3M periodically discharged spent wastewater from its fire suppression system tests onto its property and into its stormwater system until 2020.

60.     At some time prior to August 2020, 3M determined the wastewater flushed through the Springfield Plant's fire suppression system contained significantly elevated levels of PFAS. Because the fire suppression system wastewater was released onto 3M's Springfield Plant property, 3M tested the Springfield Plant's stormwater retention pond and the water discharged from the Springfield Plant's stormwater outfalls where it detected significantly elevated levels of PFOA, PFOS, PFHxS, PFBS, and other PFAS contamination.

61.     3M eventually reported its PFAS stormwater discharges to Missouri DNR and disclosed that samples of the contaminated stormwater discharged from 3M's Springfield Plant Aqueous Film Forming Foam ("AFFF") fire suppression system contained: PFOS concentrations ranging from 980-53,000 ppt; PFOA concentrations ranging from 0.5-310 ppt; and PFHxS concentrations ranging from 110-1,200 ppt. *See* Ltr. from Lisa Cardone, EHS & Security Manager, 3M Springfield, to Randall Willoughby, Water Pollution Permitting and Assistance Unit Chief, Missouri DNR (Aug. 28, 2020), attached in Exhibit B. Likewise, 3M disclosed ranges in its

15

stormwater retention pond of: PFOS concentrations between 2,000-3,000 ppt; PFHxS concentrations between 400-500 ppt; PFOA concentrations between 40-50 ppt; and PFBS concentrations between 40-50 ppt. *Id.*

62. In its correspondence with Missouri DNR, 3M asserted that its discharge of PFAS chemicals from its stormwater outfalls was covered under its stormwater discharge permit.

63. The Missouri DNR rejected 3M's assertion that PFAS chemicals from its contaminated soil were pollutants authorized to be discharged under 3M's stormwater permit. *See* Ltr. from Kevin Hess, Water Pollution Section Chief, Missouri DNR to Lisa Cardone, EHS & Security Manager, 3M Springfield (Sept. 10, 2020), attached in Exhibit B ("Further review of Missouri State Operating Permit MOR23A098, identifies that only discharges from firefighting activities during the event of a fire or testing of fire hydrants (not chemical suppression systems) are authorized. Potable water discharged through a chemical suppression system would be considered industrial wastewater and therefore not authorized for discharge under the MSOP MOR23A098.").

64. After this disclosure, 3M began collecting a portion of the wastewater flushed through its AFFF fire suppression system and installed GAC filters to reduce PFAS levels in this industrially contaminated stormwater and the water stored in its stormwater retention pond.

65. Despite implementing these measures in 2020 to control the release of PFAS from its AFFF fire suppression system tests, PFOA, PFOS, PFHxS, PFBS, and other PFAS remain in 3M's stormwater system, its retention pond, the soil and infrastructure on 3M's Springfield Plant property, and in the water used in its fire suppression system tests which 3M does not collect. Water samples taken from stormwater outfalls at the Springfield Plant and from the stormwater retention pond, which has overflowed at least twice (in January and March 2023) and serves as a

16

contaminant source to the area, consistently have PFOS concentrations above 4 ppt and as high as 850 ppt. *See* Exhibit C (3M Presentation to City Utilities and Missouri DNR on PFAS levels at 3M's Springfield Plant, Dec. 2023). However, 3M has reported in letters to Missouri DNR that even higher levels of PFOS and other PFAS chemicals have been detected in its retention pond and stormwater samples.

66.     Despite being aware of its discharges of PFAS from the Springfield Plant property and having reported the same to Missouri DNR since at least 2020, 3M did not notify City Utilities of the amount of PFAS in its discharges, which leave the Springfield Plant property approximately three miles upstream from City Utilities' Blackman WTP intake.

67.     In March of 2022, 3M tested finished drinking water received at its facility from City Utilities' Blackman WTP and discovered several PFAS were present, including PFOS at a level of 20 ppt (five times EPA's ultimate MCL).

68.     Subsequently, 3M notified City Utilities of this result but asserted in writing that it was not due to 3M's activities: "3M does not have reason to believe that it is the source of the PFAS detected in the City Utilities' water supply, as 3M does not have any operations located near the municipal water wells for the City of Springfield." *See* 3M Presentation to City Utilities on City of Springfield Water Samples & Municipal Wells (March 2022) (photograph below and on file with plaintiff).



69.     Significantly, 3M neglected to state that it could not be the source because it ***did not discharge PFAS*** from its Springfield Plant.  Instead, it claimed it was not the source because it was not proximate to City of Springfield wells. However, as is evident from City Utilities' Complaint, 3M's Springfield Plant is approximately three miles upstream of City Utilities' James River Blackman WTP intake, making the Springfield Plant the clear source of PFAS contamination.

70.     City Utilities' watershed sampling shows no PFAS contamination of the James River above the confluence of the James River and Pearson Creek. Also, no PFAS contamination is seen in Pearson Creek above the 3M site. The contamination is proximately related to both surface and groundwater contamination at the 3M site.

71.     As a result, every time it rains, 3M discharges PFOA, PFOS, PFHxS, PFBS, and other PFAS through its stormwater system into the sinkhole and into Jones Spring, Pearson Creek,

and finally the James River just upstream from City Utilities' raw water intake for the Blackman WTP.

72.     On information and belief, groundwater contaminated with PFOA, PFOS, PFHxS, PFBS, and other PFAS from the soil and 3M's Springfield Plant stormwater facilities flows into karst features and sinkholes, including sinkhole G28, and other receptors adjacent to the property and, ultimately, into Jones Spring, before entering Pearson Creek and the James River upstream from City Utilities' raw water intake.

73.     Water samples taken from Jones Spring between August 2023 and March 2024 consistently detected PFAS, including PFOS values in excess of 100 ppt, PFOA above 5 ppt, PFHxS above 40 ppt, and PFBS in excess of 20 ppt.

74.     Jones Spring discharges into Pearson Creek. Samples collected between May 2023 and March 2024 reveal PFOA, PFOS, PFHxS, and other PFAS consistently above 10 ppt. By contrast, water samples from Pearson Creek taken upstream from, and, thus, not influenced by, Jones Spring, have consistently not detected PFAS.

75.     Samples taken from the James River upstream of its confluence with Pearson Creek and from other tributaries of the James River upstream of the Blackman WTP during this time period also have not detected PFAS. Conversely, samples taken just downstream of the James River's confluence with Pearson Creek and just upstream of its water intake have detected PFOS, PFBS, and PFHxS.

76.     Because levels of PFOS in the James River are consistently above EPA's MCL for PFOS, City Utilities will have to install PFAS barrier technology at the Blackman WTP.

77. City Utilities' data demonstrate that discharges from 3M's stormwater system at 3M's Springfield Plant are the major source of PFOS and other PFAS detected at the James River intake for the Blackman WTP.

78. 3M's continuing discharges appear to have been ongoing for several decades and it may take years or decades for existing contamination within Jones Spring to be ameliorated or removed.

## COUNT I:

### 3M's Violations of its National Pollutant Discharge Elimination System Permit and the Clean Water Act (33 U.S.C. § 1311 *et seq.*)

79. City Utilities repeats, re-alleges, and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

80. The James River is a navigable in-fact waterway that is, along with its tributaries Jordan Creek and Pearson Creek, a water of the United States under the CWA. *See* 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2(a)(1).

81. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into the navigable waters of the United States unless pursuant to a NPDES permit issued under Section 402 of the CWA, 33 U.S.C. § 1342.

82. A discharge of pollutants from a point source that reaches navigable waters through groundwater is also prohibited under the CWA without a permit if the discharge is the functional equivalent of a direct discharge to navigable waters. *See Cnty. of Maui*, 590 U.S. at 186.

83. EPA delegated authority to implement the permitting programs of the CWA, including the NPDES program, to the State of Missouri pursuant to 33 U.S.C. § 1342(b). Missouri DNR administers the CWA's permitting programs within the State of Missouri. Mo. Rev. Stat. §§ 644.021, 644.026.1(26).

Case 6:24-cv-03164-SRB   Document 1   Filed 06/03/24   Page 20 of 32

84.     Citizen suits may be brought for the discharge of pollutants into waters of the United States without a permit or in violation of a permit under 33 U.S.C. § 1365(a)(1).

85.     Discernable, confined, and discrete conveyances are "point sources" under the CWA and include pipes, ditches, channels, and conduits. 33 U.S.C. § 1362(14). 3M's fire suppression system constitutes a discernable, confined, and discrete conveyance and is, therefore, a point source under the CWA. *Id.* Likewise, 3M's five stormwater outfalls discharging stormwater flowing off of 3M's Springfield Plant are also discernible, confined, and discrete conveyances and point sources under the CWA. *Id.* Finally, the culvert through which stormwater flows off of 3M's Springfield Plant site is also a discernible, confined, and discrete conveyance that is a "point source" under the CWA.

86.     Chemical wastes and industrial wastes are included in the definition of a "pollutant" in the CWA. 33. U.S.C. § 1362(6). Missouri DNR has determined that residual flows from the testing of 3M's fire suppression system are industrial wastes. As a result, the PFOA, PFOS, PFHxS, PFBS, and other PFAS discharged from 3M's fire suppression system and stormwater outfalls are industrial and chemical wastes under the CWA.

87.     An NPDES permit is required for stormwater discharges associated with an industrial activity under the CWA. 33 U.S.C. § 1342(p). An industrial user is defined under the CWA as an industry listed in the Standard Industrial Classification Manual under the category of "Division D – Manufacturing." 33 U.S.C. § 1362(18). 3M's Springfield Plant is categorized within SIC Code Major Group 28 within Division D of the Standard Industrial Classification Manual. The 3M plant is thus an industrial user as defined by the CWA and requires a permit to discharge stormwater. 33 U.S.C. § 1342(p).

88.    3M operates under stormwater permit MOR23A098 as issued by the Missouri DNR and is required to comply with the terms of the permit. Each instance during which 3M violates its permit is a separate violation of the CWA. 33 U.S.C. § 1319(d).

89.    Under the terms of its stormwater NPDES permit, 3M may discharge stormwater but not process wastewater or water used to wash machinery or equipment through the stormwater system at its Springfield Plant. General Permit MO-R23A, Mo. Dep't Nat. Res. ¶13 (effective Nov. 1, 2020). The PFAS in 3M's outdoor fire suppression system was and is used as part of its industrial manufacturing process and the wastewater flushed through the system was and is process water used to test the fire suppression system equipment. The water used to test 3M's AFFF fire suppression system was and is therefore process wastewater that MOR23A098 does not authorize 3M to discharge through its stormwater system. As a result, 3M violated and continues to violate MOR23A098 when it discharged and discharges the water used to test its fire suppression system wastewater, containing PFOA, PFOS, PFHxS, PFBS, and other PFAS through (1) its stormwater system and (2) into groundwater through a number of avenues, including sinkhole G28, and ultimately into Jordan Creek, Pearson Creek, and the James River.

90.    Water samples from 3M's Springfield Plant stormwater retention pond between 2020 and 2023 consistently detected PFOS concentrations above 1000 ppt and, as recently as February 2023, as high as 5410 ppt. The retention pond has overflowed onto 3M's Springfield Plant property at least twice, in January and March 2023, and serves as a contaminant source to the Springfield Plant's soil and stormwater collection and discharge infrastructure. On information and belief, the retention pond has overflowed since March 2023 and spread PFAS contaminants further around the Springfield Plant.

91.     Even after GAC treatment, samples of the water discharged from the stormwater detention pond have contained PFOS in excess of EPA's MCL of 4 ppt – a direct violation of Missouri's Metropolitan No-Discharge prohibition and instream drinking water standards. On information and belief, these discharges also routinely contain PFOA, PFHxS, PFBS, and other PFAS in excess of EPA's MCLs.

92.     Stormwater samples taken from the four other outfalls at the Springfield Plant, receiving no GAC treatment have revealed (in 2022) the presence of PFOA (9.9 ppt), PFOS (300 ppt), PFHxS (93.0 ppt), PFBS (22 ppt), and other PFAS. Further stormwater samples taken from those same untreated outfalls in 2023 continued to detect PFOA (5.7 ppt), PFOS (578 ppt), PFHxS (79 ppt), PFBS (9.5 ppt), and other PFAS. On information and belief, every time it rains the 3M Springfield Plant discharges stormwater contaminated with PFOA, PFOS, PFHxS, PFBS, and other PFAS off its property and into groundwater. 3M's stormwater travels off the Springfield Plant, into groundwater features including sinkhole G28 on the adjacent property, through the karst landscape, and into Pearson Creek before flowing into the James River.

93.     These ongoing discharges of industrial process and chemical wastes through 3M's stormwater infrastructure and groundwater violate general permit MOR23A098 and are otherwise unpermitted and unlawful.

94.     MOR23A098 also "does not authorize discharges which are located in a way to allow water to be released into sinkholes, caves, fissures, or other openings in the ground which could drain into aquifers directly or indirectly." General Permit MO-R23A, Mo. Dep't Nat. Res. ¶5.

95.     3M thus violates MOR23A098 every time it discharges stormwater contaminated with PFOA, PFOS, PFHxS, PFBS, and other PFAS into the sinkhole (and other features such as

karst) adjacent to its property that drains into Jordan Spring, Pearson Creek, and ultimately the James River.

96.     Likewise, MOR23A098 prohibits the discharge of contaminated stormwater into Metropolitan No-Discharge Streams. General Permit MO-R23A, Mo. Dep't Nat. Res. ¶4.

97.     3M is discharging stormwater contaminated with PFAS through groundwater, including sinkhole G28 on its adjacent property to Jordan Spring which flows into Pearson Creek. Pearson Creek is a Metropolitan No-Discharge Stream along its entire length. 3M thus violates MOR23A098 every time it discharges stormwater contaminated with PFOA, PFOS, PFHxS, PFBS, and other PFAS into the sinkhole that drains into Jordan Spring and ultimately Pearson Creek, a Metropolitan No-Discharge Stream.

98.     The Court should immediately enjoin 3M from further such illegal discharges to surface and groundwaters and order 3M to fund GAC technology at the Blackman WTP.

## COUNT II:

**3M's Discharges of Pollutants to Waters of the United States Without
a National Pollutant Discharge Elimination System Permit
Violate the Clean Water Act (33 U.S.C. § 1311(a))**

99.     City Utilities repeats, realleges, and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

100.     As described above, MOR23A098 authorizes 3M to discharge stormwater from its Springfield Plant but does not authorize 3M to discharge PFOA, PFOS, PFHxS, PFBS, or other PFAS industrial wastes into Jordan Creek, Jones Spring, Pearson Creek, or the James River. Testing at all five of 3M's stormwater outfalls at the Springfield Plant demonstrates that 3M has discharged and, on information and belief, continues to discharge PFOA, PFOS, PFHxS, PFBS, and other PFAS into the James River directly through Jordan Creek and through Jones Spring and

Pearson Creek by way of several avenues including at least one sinkhole (G28) on the property adjacent to its Springfield Plant.

101.     As described above, 3M releases these compounds from its fire suppression system pipes, point sources, onto its Springfield Plant property and then further discharges them through stormwater conduits, outfalls, and culverts, also point sources, into the waters of the State of Missouri and United States during rain events.

102.     Because 3M does not have an individual NPDES permit authorizing the discharge of PFOA, PFOS, PFHxS, PFBS, or other PFAS and is discharging these PFAS through its stormwater system, 3M is in violation of both its general permit and the CWA, 33 U.S.C. § 1311(a). These unpermitted discharges are ongoing, at least every time it rains.

103.     In addition, on information and belief, 3M continues to discharge PFOA, PFOS, PFHxS, PFBS, and other PFAS into waters of the State of Missouri and United States and ultimately to the James River through its groundwater. Historic and continuing releases of PFOA, PFOS, PFHxS, PFBS, and other PFAS accumulate within the soil, culverts, ditches, stormwater retention pond, and other infrastructure at 3M's Springfield Plant.

104.     These PFAS within the soil and infrastructure of the Springfield Plant move into and through groundwater into the G28 sinkhole and other karst features adjacent to 3M's facility. From this sinkhole and other features, the PFAS move over the course of approximately two days into Jones Spring, Pearson Creek, and ultimately into the James River just a mile and a half upstream from City Utilities' water intake on the James River. Due to their persistence and stability, the PFAS do not degrade as they move through groundwater into the James River. In other words, 3M has and continues to discharge PFOA, PFOS, PFHxS, PFBS, and other PFAS through the

25

extensive, direct groundwater connections between its Springfield Plant and Jones Spring, and on to the James River.

105.     Even if the ongoing discharges of PFAS could be stopped, City Utilities believes that it could take years or decades for high levels of PFAS to abate from Jones Spring.

106.     Due to the geology, hydrology, and hydrogeology of 3M's Springfield Plant and the nature, persistence, mobility, and other properties of PFAS, 3M's discharge of these PFAS pollutants is "the functional equivalent" of an ongoing, direct discharge of PFOA, PFOS, PFHxS, PFBS, and other PFAS from a point source into navigable waters of the State of Missouri and United States. *See Cnty. of Maui*, 590 U.S. at 186.

107.     These ongoing discharges of PFAS from the Springfield Plant site into the waters of the State of Missouri and United States, including the James River and through groundwater, are unpermitted under 33 U.S.C. § 1311 and are, therefore, unlawful continuing discharges.

## COUNT III:

### 3M's Violations of the
### Resource Conservation and Recovery Act (42 U.S.C. § 6972)

108.     City Utilities repeats, re-alleges, and incorporates by reference the allegations set forth in the foregoing paragraphs as though fully set forth herein.

109.     Section 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), of RCRA authorizes persons to bring suit "against any person . . . including any past or present generator . . . who has contributed or is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."

110.    The term "solid waste" is defined as any "garbage, refuse . . . and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations." 42 U.S.C. § 6903(27).

111.    The term "disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste . . . into or on any land or water so that such solid waste . . . or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

112.    As described above, EPA has proposed an MCL of 4 ppt for PFOS and PFOA, 10 ppt for PFHxS, and a composite hazard index for PFHxS and PFBS (among other PFAS chemicals) in drinking water. EPA proposed these threshold concentrations to account for the risks PFOA, PFOS, PFHxS, PFBS, and other PFAS pose to human health and the environment.

113.    Likewise, EPA has designated PFOA and PFOS as hazardous substances under CERCLA due to their potential to present a substantial danger to the public health or welfare and the environment when released.

114.    The industrial wastewater discharged from 3M's fire suppression system is a liquid foam chemical waste that 3M generates, handles, and then discards during its industrial operations. It is clearly a "solid waste" under RCRA. 42 U.S.C. § 6903(27). 3M has "disposed" of this industrial waste (fire suppression system wastewater containing PFAS) that it generated by discharging it through the pipes of the fire suppression system and into the ditches and culverts of its stormwater system as well as onto the soil of its Springfield Plant. 42 U.S.C. § 6903(3).

115.    Samples taken of this industrial waste record PFOA (0.05-317 ppt), PFOS (980-53,000 ppt), and PFHxS (110-1,200 ppt) concentrations dangerously in excess of EPA's MCLs for drinking water. As described above, samples taken directly from stormwater outfalls at 3M's

27

Springfield Plant which receive no treatment, consistently detect concentrations orders of magnitude above EPA's MCL for PFOA, PFOS, PFOA, and PFHxS. Similarly, samples from 3M's stormwater retention pond, which has overflowed at least twice, in January and March 2023, and served as a contaminant source to the area, consistently have PFOS concentrations above 1000 ppt and as high as 5410 ppt. The one outfall discharging water from 3M's stormwater retention pond (the only stormwater outfall 3M treats with GAC) has still discharged and likely continues to discharge stormwater exceeding EPA's MCL concentration of 4 ppt PFOS. Finally, on information and belief, groundwater at the 3M Springfield Plant, contaminated with PFOA, PFOS, PFHxS, PFBS, and other PFAS from the disposal of 3M's industrial fire system wastewater, is moving off the plant property into at least one sinkhole (G28) on the property adjacent to 3M's Springfield Plant and from there into Pearson Creek and the James River.

116.    As described above, water samples taken from Jones Spring, Pearson Creek, and the James River, adjacent to City Utilities' intake for its public water supply, demonstrate that 3M's disposal and discharge of its industrial wastewater is the cause of the PFOA, PFOS, PFHxS, PFBS, and other PFAS found in downstream waters of the State of Missouri and United States, including the James River from which City Utilities withdraws public drinking water.

117.    As such, 3M's voluntary remediation measures, the GAC filtration of discharges from one stormwater outfall and the collection and treatment of some of the water used to test its fire suppression and hydrant systems, are inadequate to prevent the release of PFOA, PFOS, PFHxS, PFBS, and other PFAS into groundwater (including sinkhole G28) and ultimately into City Utilities' James River drinking water supply – all in contravention of 3M's industrial stormwater permit. In fact, 3M has recorded a PFOS level of 20 ppt in the finished drinking water

City Utilities provided to the 3M Springfield Plant in March of 2022. That result is five times EPA's final MCL for PFOS.

118.    3M's ongoing disposal and release of PFOA, PFOS, PFHxS, PFBS, and other PFAS from its Springfield Plant into waters of the United States and the State of Missouri, including Jordan Creek, Jones Spring, Pearson Creek, and the James River, presents an imminent and substantial endangerment to human health and the environment. The EPA has recognized the public health risk associated with these PFAS and imposed an MCL to protect public drinking water supplies. EPA has also listed PFOA and PFOS as hazardous substances under CERCLA.

119.    Due to EPA's MCL, City Utilities must ensure the drinking water it provides the City of Springfield has concentrations of less than 4.0 ppt of PFOS and PFOA, less than 10 ppt of PFHxS, and less than an aggregate score of 1 for other PFAS, including PFBS and PFHxS, incorporated in EPA's hazard index.

120.    On information and belief, City Utilities is the largest of just a handful of water systems statewide with PFAS levels above EPA's MCLs.

121.    3M's RCRA violations continue to harm City Utilities, its customers, and the Jordan Creek, Pearson Creek, and the James River ecosystems. City Utilities has no other adequate remedy at law.

122.    Section 7002(a) of RCRA, 42 U.S.C. § 6972(a), authorizes the Court to restrain persons contributing to the endangerment of health or environment referred to in 42 U.S.C. § 6972(a)(1)(B) or "to order such person to take such other action as may be necessary, or both," to eliminate the endangerment.

123.    The Court should issue an enforcement order and injunction order to the Defendant, 3M, to cease their discharges of PFAS and to remediate their RCRA violations under 42 U.S.C.

§ 6972(a) by, at a minimum, funding the installation of the appropriate treatment technology at the Blackman WTP that will satisfy EPA's MCL requirements and protect the public water supply in the City of Springfield.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, City Utilities, respectfully requests that this Court grant the following relief:

A.      Enter a declaratory judgment that 3M has violated and is violating the terms and conditions of its NPDES permit and is in violation of the CWA, 33 U.S.C. § 1311(a);

B.      Enter a declaratory judgment that 3M's handling and disposal of its industrial wastewater from its fire suppression system at its Springfield Plant presents an imminent and substantial endangerment to human health and the environment pursuant to 42 U.S.C. § 6972(a)(1)(B);

C.      Issue a permanent injunction requiring 3M to cease its unpermitted CWA discharges into the James River, including any necessary remediation to effectuate the cessation of PFAS discharges from its Springfield Plant site, and its violation of the terms and conditions imposed in its NPDES permit;

D.      Issue a permanent injunction requiring 3M to remediate Jones Spring, Jones Branch, Pearson Creek, and other tributaries of the James River;

E.      Issue an injunction ordering 3M to meet and confer with City Utilities to agree upon a timeline for the design and installation of a GAC filter system at the Blackman WTP that is sufficient to reduce PFAS levels in the Blackman WTP's drinking water below federal and/or state PFAS requirement (including EPA's final MCLs). The cost of design, installation, and operation

30

of the GAC filter will be borne solely by 3M. Installation of the GAC filter shall be completed as soon as practicable, but no later than the five-year deadline for compliance with EPA's MCLs;

      F.     Issue an injunction requiring 3M to perform monthly sampling at the James River intake pipe for the Blackman WTP and report the results of such sampling to City Utilities. Sampling results shall be submitted to City Utilities no later than the 25th day of the month following the reporting period;

      G.     Issue an injunction authorizing City Utilities or its agents to sample, or arrange for sampling, of any discharge of pollutants from 3M's outfalls and groundwater for the period beginning on the date of the Court's order and running for five years after the date 3M achieves compliance with the CWA;

      H.     Impose appropriate civil penalties;

      I.     Award attorneys fees and expenses; and

      J.     Any such additional relief the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Respectfully Submitted June 3, 2024.


F. PAUL CALAMITA
(MO Bar No. 65398)

**AQUALAW PLC**
6 South 5th Street
Richmond, VA 23219
Telephone: 804/716-9021 ext. 201
804/716-9022 (fax)
Paul@AquaLaw.com

31

**ROBBINS GELLER RUDMAN
  & DOWD LLP**
MARK DEARMAN (*Pro Hac Vice* Pending)
DOROTHY P. ANTULLIS (*Pro Hac Vice*
Pending)
NICOLLE B. BRITO (*Pro Hac Vice* Pending)
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
mdearman@rgrdlaw.com
dantullis@rgrdlaw.com
nbrito@rgrdlaw.com